# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| JOSHUA DANZIG, individually, and on behalf of himself, and all others similarly situated,<br><br>                Plaintiff,<br><br>        - against -<br><br>BP, PLC.; BP AMERICA, INC.; BP CORPORATION NORTH AMERICA, INC. F/K/A BP AMOCO CORPORATION; BP COMPANY NORTH AMERICA, INC.; BP PRODUCTS NORTH AMERICA, INC.; TRANSOCEAN, LTD.; TRANSOCEAN DEEPWATER, INC.; TRANSOCEAN OFFSHORE DEEPWATER DRILLING, INC.; HALLIBURTON ENERGY SERVICES, INC.; CAMERON INTERNATIONAL CORPORATION F/K/A COOPER CAMERON CORPORATION; M-I, LLC; ANADARKO PETROLEUM CORP.; and MOEX OFFSHORE 2007, LLC,<br><br>                Defendants. | Case No. _____<br><br>Section No. _____<br><br><br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Joshua Danzig, individually, and on behalf of all others similarly situated (the "Class," defined below), by his undersigned attorneys, alleges upon personal knowledge as to his own acts and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.      Plaintiff is the owner of real property along the Gulf of Mexico on the northwestern coast of the State of Florida. He brings this class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of himself and all others similarly situated against Defendants for losses and damages arising out of the catastrophic oil spill caused by the April

20, 2010 explosion and subsequent sinking of the offshore oil rig *Deepwater Horizon* (the "*Deepwater Horizon*"), operated by Transocean (as defined herein), in the Gulf of Mexico – approximately 50 miles from the Louisiana coast. The incident killed 11 workers, and critically injured four of the remaining 115-person crew.

2.      Following the sinking of the *Deepwater Horizon* on April 22, 2010, an estimated 504,000 gallons a day have been leaking from the oil well upon which the *Deepwater Horizon* was performing completion operations, as well as from the pipe connected to it – the drill stack. To date, government estimates surmise that *23.7 million to 51.5 million gallons of oil* have already hemorrhaged into the Gulf.

3.      In addition, there is now more than *1 million gallons of toxic dispersant* that Defendants have added to Gulf waters both on the surface and in experimental undersea applications directly on the leaking wellhead – the largest quantity of dispersant deployed to date to break up an oil spill in United States water – in an unsuccessful attempt to plug the still gushing oil.

4.      The fast-moving oil slick, which has grown exponentially since April 20th, has, among other things, caused detrimental effects upon the Gulf of Mexico's marine, coastal and estuarine environments, and damaged the beachfront and coastal areas of the Gulf of Mexico, including northwestern Florida, where Plaintiff's property is located. The oil spill has damaged and will continue to damage the value of Plaintiff's and Class Member's real and personal property, earning capacity, business income, and/or use of natural resources.

5.      On May 3, 2010, BP (as defined herein) admitted that it "*takes responsibility for responding to the Deepwater Horizon oil spill. We will clean it up.*" (Emphasis added). BP also

said it "will pay all necessary and appropriate clean-up costs," stemming from the oil pollution disaster in the Gulf of Mexico.

6.     Moreover, its company statement, BP vowed to consider all compensation claims "promptly" and pay them quickly if justified – adding that the company was "committed to pay legitimate and objectively verifiable claims for other loss and damage caused by the spill." In particular, as the company has acknowledged, "[t]his may include claims for assessment, mitigation and clean-up of spilled oil, real and property damage caused by the oil, personal injury caused by the spill, *commercial losses including loss of earnings/profit and other losses as contemplated by applicable laws and regulations*." (Emphasis added).

7.     Plaintiff and the Class Members herein allege some of the very same (and legitimate) claims that BP has committed itself to considering and paying as a result of this catastrophic oil spill. In particular, Plaintiff and the Class Members are owners of real property directly affected by the oil spill. With the wellhead continuing to gush hundreds of thousands of gallons of oil per day into the waters near western Florida, Plaintiff and Class Members are suffering and will continue to suffer serious losses.

8.     While BP has said it would pay for the clean-up, it has blamed the equipment failure on Transocean, as operator of *Deepwater Horizon*. Also, Halliburton, who was responsible for sealing with cement the oil extracting drill below the Gulf surface, has been criticized about the cementing of the oil well and pipe that was completed 20 hours before the explosion. Then, there is Cameron, which made the blowout preventer that failed to engage. Despite this finger-pointing, the fire and explosion on the *Deepwater Horizon*, its sinking and the resulting oil spill were caused by the gross negligence of each of the Defendants, rendering them liable jointly and severally to Plaintiff and the Class Members for all their damages.

<u>**PARTIES**</u>

<u>**Plaintiff**</u>

9.      Plaintiff Joshua Danzig is a Louisiana resident doing business in this District, who owns a beachfront rental property along the Gulf of Mexico in Santa Rosa Beach, Florida. *See* Map of Santa Rosa Beach, Florida, attached hereto as Exhibit A. As a result of the events described herein, Plaintiff already has suffered ascertainable losses and damages, and will continue to suffer additional losses and damages for the foreseeable future.

<u>**Defendants**</u>

<u>*The BP Defendants*</u>

10.      Defendant BP, Plc. is a British corporation, organized under the laws of the United Kingdom. BP, Plc. does business within this District, in the State of Louisiana, and throughout the Untied States.  BP, Plc. is one of the world's largest oil companies.

11.      Defendant BP America, Inc. ("BP America") is a Delaware corporation with its principal place of business in Warrenville, Illinois. BP America does business within this District, in the State of Louisiana, and throughout the Untied States. BP America is a subsidiary of BP.

12.      Defendant BP Corporation North America, Inc., f/k/a BP Amoco Corporation ("BP Amoco"), is an Indiana corporation with its principal place of business in Houston, Texas. BP Amoco does business within this District, in the State of Louisiana, and throughout the Untied States.  BP Corporation North America, Inc. is a subsidiary of BP America.

13.      Defendant BP Company North America, Inc. ("BP NA") is a Delaware Corporation with its principal place of business in Warrenville, Illinois. BP NA does business within this District, in the State of Louisiana, and throughout the Untied States. BP NA is a subsidiary of BP Amoco.

14.     Defendant BP Products North America, Inc. ("BP Products") is a Maryland corporation, with its principal place of business in Houston, Texas. BP Products does business within this District, in the State of Louisiana, and throughout the Untied States. BP Products is a subsidiary of BP Company North America, Inc.

15.     Defendants BP America, BP Amoco, BP NA and BP Products are wholly owned subsidiaries of the global parent corporation, Defendant BP, Plc.  Collectively, they are all referred to herein as "BP."

*The Transocean Defendants*

16.     Defendant Transocean, Ltd. ("Transocean, Ltd.") is a Swiss corporation. Transocean, Ltd. does business within this District and in the State of Louisiana. Transocean Ltd. is the world's largest offshore drilling contractor and leading provider of drilling management services worldwide.

17.     Defendant Transocean Deepwater, Inc. ("Transocean Deepwater") is a Delaware corporation with its principal place of business in Houston, Texas. Transocean Deepwater does business within this District, in the State of Louisiana and throughout the United States. Transocean Deepwater is a subsidiary of Transocean Ltd.

18.     Defendant Transocean Offshore Deepwater Drilling, Inc. ("Transocean Offshore") is a Delaware corporation with its principal place of business in Houston, Texas. Transocean Offshore does business within this District, in the State of Louisiana and throughout the United States. Transocean Offshore is a subsidiary of Transocean Ltd. Transocean is the world's largest offshore drilling contractor.

19.     Defendants Transocean Deepwater and Transocean Offshore are wholly owned subsidiaries of the global parent corporation, Transocean Ltd. Collectively, they are all referred to herein as "Transocean."

*Defendant Halliburton*

20.     Defendant Halliburton Energy Services, Inc. ("Halliburton") is a Delaware corporation with two headquarters, one in Houston, Texas and one in Dubai, United Arab Emirates. Halliburton does business within this District, in the State of Louisiana and throughout the United States. Halliburton is one of the world's largest providers of products and services to the energy industry.

*Defendant Cameron*

21.     Defendant Cameron International Corporation f/k/a Cooper-Cameron Corporation ("Cameron") is a Delaware Corporation with its principal place of business in Houston, Texas. Cameron does business within this District, in the State of Louisiana and throughout the United States. Cameron is a global provider of pressure control, processing, flow control and compression systems as well as project management and aftermarket services for the oil and gas and process industries.

*Defendant M-I*

22.     Defendant M-I, LLC ("M-I") is a Texas corporation with its principal place of business in Houston, TX. M-I does business within this District, in the State of Louisiana and throughout the United States. M-I, known as M-I SWACO, supplies drilling and completion fluids and additives to oil and gas companies, providing pressure control, rig instrumentation, and drilling waste management products and services.

*Defendant Anadarko*

23.     Defendant Anadarko Petroleum Corp. ("Anadarko") is a Delaware corporation with its principal place of business in The Woodlands, Texas. Anadarko does business within this District and in the State of Louisiana. Anadarko is an oil and gas exploration and production company that owns a 25% interest in the Macondo well at Mississippi Canyon Block 252.

*Defendant MOEX*

24.     Defendant MOEX Offshore 2007, LLC ("MOEX") is a Delaware corporation and has its principal place of business in Houston, Texas. MOEX does business within this District and in the State of Louisiana. MOEX is a subsidiary of MOEX USA Corporation. MOEX holds a 10% interest in the Macondo well at Mississippi Canyon Block 252.

## JURISDICTION AND VENUE

25.     This Court has jurisdiction over this class action pursuant to 28 U.S.C. § 1332(d)(2), because the matter in controversy exceeds the sum or value of $5,000,000.00, exclusive of interest and costs, and because it is a class action brought by citizens of a State that is different from the State where at least one of the Defendants is incorporated or does business.

26.     Jurisdiction is also appropriate under 28 U.S.C. § 1331, because the claims asserted by Plaintiff arise under the laws of the United States of America, including the laws of the State of Louisiana which have been declared, pursuant to 43 U.S.C. § 1331(f)(1) and 1333(a)(2), to be the law of the United States for that portion of the outer Continental Shelf from which the oil spill originated. Title 43 U.S.C. § 1331 (1) extends exclusive Federal jurisdiction to the outer Continental Shelf.

27.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(2) because a substantial portion of the events or omissions giving rise to the claims asserted herein occurred in this District, and Defendants have received substantial compensation and other transfers of money in this District by doing business here and engaging in activities having an effect here.

## SUBSTANTIVE ALLEGATIONS

### Background

28.     *Deepwater Horizon* was an ultra-deepwater dynamic positioned semi-submersible oil rig built in 2001. It was owned by Transocean and leased to BP through September 2013. It was one of the largest rigs of its kind.

29.     BP leased the *Deepwater Horizon* to drill exploratory wells at the Macondo prospect site in Mississippi Canyon Block 252, a location on the outer Continental Shelf off the coast of Louisiana.

30.     Defendant BP holds the lease granted by the U.S. Minerals Management Service ("MMS") that allows BP to drill for oil and perform oil-production-related operations at the Macondo site in the Mississippi Canyon Block 252 section of the outer Continental Shelf in the Gulf of Mexico. As of April 20, 2010, BP operated the Macondo oil well that is the source of the current catastrophic oil spill at issue herein.

31.     Defendant Transocean owned, and BP was leasing and operating, the *Deepwater Horizon*, which was performing completion operations on the Macondo well on the outer Continental Shelf off the Gulf Coast, at the site from which the oil spill now originates.

32.     At all times material hereto, the *Deepwater Horizon* was owned, manned, possessed, managed, controlled, chartered, or operated by Transocean or BP.

33.     Defendant Halliburton was engaged in cementing operations of the well and well cap aboard the *Deepwater Horizon* and, upon information and belief, improperly and negligently performed these duties, increasing the pressure at the well and contributing to the fire, explosion and resulting oil spill.

34.     Upon information and belief, Defendant Cameron manufactured or supplied the *Deepwater Horizon*'s blow-out preventer valve ("BOPs"), a series of valves/seals that failed to

control pressure and prevent the release of oil at the time of the explosion. The BOPs were defective because they allegedly failed to operate as intended.

35.     Upon information and belief, Defendant M-I provided the drilling fluids for the *Deepwater Horizon* at the time of the explosion.

## The *Deepwater Horizon* Explosion

36.     On April 20, 2010, the *Deepwater Horizon* was creating a cement seal and plug of the wellhead as part of the final phases of turning the Macondo well from an exploratory well into a production well. "Cementing" is delicate work that carries the risk of a blowout, which is the uncontrolled release of oil from the well.

37.     During the course of this cementing work, an explosion occurred on the *Deepwater Horizon* and it caught fire, causing the deaths and injuries of many workers on the rig. Investigators believe the explosion was a blowout, likely caused by the cementing work the *Deepwater Horizon* had been performing.

38.     The fire burned for two days and the rig began to list progressively more until it finally sank on April 22, 2010.

39.     *Deepwater Horizon* had been connected to the wellhead at the seafloor by a 5,000-foot pipe called a riser. As the *Deepwater Horizon* sank to the seafloor, it pulled the riser down with it, bending and breaking the pipe before finally tearing away from it completely. The riser, bent into a crooked shape underwater, now extends from the well to 1,500 feet above the seabed and then buckles back down. Oil is flowing out from the open end of the riser and from two places along its length.

40.     The emergency valve, installed on the wellhead for just such a disaster, failed to seal the wellhead as it should have, leaving the well spewing oil into the Gulf waters.

**The Damage Caused**

41.     Although the now-leaking wellhead is fitted with a blowout preventer, the BOP, a stack of hydraulically activated valves at the top of the well designed to pinch the pipe closed, cut it, and seal off the well in the event of a sudden pressure release exactly like the one that occurred during the *Deepwater Horizon* blowout, the response teams have been unable to activate the *Deepwater Horizon*'s BOP.

42.     If the BOP on the wellhead had been functional, it could have been manually or automatically activated right after the explosion, cutting off the flow of oil at the wellhead, limiting the spill to a minute fraction of its current severity and thereby sparing Plaintiff and Class Members millions of dollars in losses and damage.

43.     More than 504,000 gallons per day of crude oil have been leaking from the wellhead and broken riser, bubbling up to the surface and flattening out into a widening slick of oil. The most recent government estimates put the total amount of oil that has hemorrhaged into the Gulf at 23.7 million to 51.5 million gallons. The growing, fast-moving, rainbow-colored smear is large enough to be visible from outer space, covering more than 3,500 square miles, and spreading with the wind and currents towards the Louisiana, Mississippi, Alabama and Florida coastlines.

44.     The ever-expanding oil slick made landfall on the fragile Louisiana coastline on April 30, 2010, and has continued to affect more and more Gulf coastline as it is driven landward by winds and currents. In fact, elevated southerly winds have pushed the perimeter of the spilled oil to shorelines as far east as the Florida Panhandle, where Plaintiff's real property is located. NOAA predicts that the scattered tar balls and light sheen of oil could impact beaches as far east as Walton County, including the resort town of Santa Rosa Beach, Florida, and Bay County, home to popular vacation destinations in Panama City, Florida.

45.     As of June 5, 2010, Florida beaches remained open but the number of beachgoers was reduced due to brown globs of oil washing up on the sand, as well as reasonable fears of ongoing pollution damage. Specifically:

- Reports of tarballs and areas of light sheen have been confirmed by reconnaissance teams from Escambia to Bay County, Florida;

- Oil Containment Boom (in feet) total: 311,780 deployed in Florida;

- Protective booming and boom maintenance is being conducted in the coastal areas of Bay, Escambia, Franklin, Gulf, Okaloosa, Santa Rosa, and Walton Counties;

- According to NOAA's oil plume model, the primary oil plume is 13 miles from Pensacola, 100 miles from Gulf County, and 280 miles from St. Petersburg, with non contiguous sheens and scattered tarballs closer. NOAA trajectories show direct on-shore impacts of scattered tarballs and light sheen;

- 360 vessels are deployed in Florida for the Vessels of Opportunity program;

- 224 Qualified Community Responders are actively working the cleanup efforts in the Florida Panhandle;

- 3 staging areas are in place to protect sensitive shorelines in Florida; and

- The fishery failure declaration for the Gulf of Mexico includes Florida, providing impacted and eligible commercial fisheries the opportunity for federal support.

46.     Although BP has undertaken several attempts to stop the flow to the leaking well, the relief effort has been unsuccessful so far and may take months (or even years) to complete, while oil continues to flow uncontrolled out of the leaking well.

47.     The spilled oil has already caused substantial damage to the Gulf of Mexico's marine, coastal and estuarine environments. With the unabated wellhead gushing of hundreds of thousands of gallons of oil per day into the waters near coastal northwest Florida, Plaintiff and Class Members are suffering and will continue to suffer serious losses.

48.     At the time of this filing, the wellhead has not been capped and the flow of oil continues unabated into the Gulf waters.

49.     In addition, as of June 7, 2010, it was estimated that more than 779,000 gallons of toxic dispersants have been applied on the surface and 317,000 gallons have been pumped deep into the water column by BP, in an effort to dilute the oil. This is the largest quantity of dispersant deployed to date to break up an oil spill in United States waters.

50.     While the media has compared this spill to the 1989 Exxon Valdez disaster, one crucial difference is that the Valdez was a tanker with a limited supply of oil. Experts estimate that the volume of this continuous gush of oil will eclipse that of the Valdez spill within 50 days. In contrast, the relief well will most likely take 60 to 90 days to complete, virtually ensuring this spill's classification as the worst oil spill in history.

51.     Even worse, the floating booms BP has set out to block the oil from reaching the coastline may be too low or placed too far out to sea to be useful. Experts report that anything higher than a three-foot wave will clear the boom, lifting the oil slick over the barriers with it. Over the past few days, the Gulf has been experiencing seven- to ten-foot swells, diminishing the usefulness of any of these booms.

52.      As the oil continues to make landfall along the Gulf Coast, it will cause severe damage to the delicate wetlands and intertidal zones that line the coast of Louisiana and Florida, among others, destroying the habitats where fish, shellfish, and crustaceans breed, spawn, and mature.

53.     On May 2, 2010, the National Oceanographic and Atmospheric Administration ("NOAA") restricted fishing for in Federal waters between Louisiana state waters at the mouth of the Mississippi River and the waters off Florida's Pensacola Bay, a total area of 6,800 square

miles. On May, 24, 2010, NOAA and U.S. Commerce Secretary Gary Locke determined there has been a "fishery disaster" in the Gulf of Mexico due to the economic impact on commercial and recreational fisheries from the ongoing *Deepwater Horizon* oil spill. The affected area includes the states of Louisiana, Mississippi, Alabama and Florida.

54.     On June 2, 2010, NOAA extended the boundaries of the closed commercial and recreational fishing areas in the Gulf of Mexico – the most significant expansion includes an area off southwest Florida, near the waters of Santa Rosa Beach. The closed area now represents 88,502 square miles, which is slightly less than 37 percent of Gulf of Mexico federal waters.

55.     On June 10, 2010, as tar balls and crude oil "mousse" entered Perdido Bay in northwest Florida, near the tourist haven of Pensacola – which is approximately 30 miles from Plaintiff's real property in Santa Rosa Beach – state and local officials stepped up skimming operations in an attempt to protect spawning areas from becoming tainted by the oil. Mike Sole, secretary of the Florida Department of Environmental Protection, said the heavier concentrations of oil should continue to arrive on northwest Florida shores over the next several days:



Source: Google maps, http://maps.google.com/maps?hl=en&q=santa+rosa+beach+fl&um=1&ie
=UTF-8&hq=&hnear=_Santa+Rosa+Beach,+FL&gl=us&ei=2mARTPORA4K8lQe725WDCA&
sa=X&oi=geocode_result&ct=image&resnum=1&ved=0CCEQ8gEwAA (last visited June 10,
2010) (red pin indicates location of Santa Rosa Beach, Florida).

56.     Florida meteorologist, Amy Godsey, said a prevailing Gulf of Mexico current
known as "The Loop" has begun to reattach itself to a more northerly "Loop Ring" that has kept
the bulk of spilled oil from working its way into the Straits of Florida. But, oceanographers now
conclude it is likely that oil from the spill *will* enter the Florida Straits. If that occurred, oil would
be carried by the Gulf Stream along Florida's heavily populated Atlantic coast and then further
up the eastern seaboard.

57.     As the oil continues to make landfall along the Gulf Coast, it will cause continued
severe damage to the white sand beaches that line the coasts of Florida, destroying their natural
beauty and diminishing the value of beachfront property, including Plaintiff's real property and
the real property owned by other members of the Class.

58.     The Gulf Coast ranks number one among the nation's destinations for Americans
that swim, fish, dive, and otherwise enjoy the region's many beaches, coastal wetlands, and
shores. In fact, there are over 550,000 seasonal or vacation homes or housing units along the
Gulf coast. More than 20 million people visitors enjoy the Gulf coast beaches each year.

59.     The timing of this disaster makes it even more damaging as it is now the summer
tourist and vacation season. The physical and reputational sullying of the Gulf coast's pristine
beaches has already resulted in cancellations of pre-booked trips. Because of the spilled oil,
vacationers, beachgoers and boaters are avoiding the region, planning their trips to other
destinations instead.

60.     The stigma of the spill is expected to last for longer than the actual oil damage does, further affecting the coastal economy for years to come. In fact, according to an *Associated Press* article, titled "Oil Spill Ripples Through Florida Economy," from June 9, 2010, one economist calculated that Florida, alone, could lose up to 195,000 jobs and **nearly $11 billion** in economic activity from the prolonged impact of oil washing up on Florida shores.

61.     The oil spill and the resulting contamination have caused and will continue to cause loss of property value, rental value, and rental income for properties located on the Gulf of Mexico and Florida's shore. Plaintiff owns rental property in Santa Rosa Beach, Florida. As of the filing of this Complaint, due to the oil spill, Plaintiff has no rentals booked for after July 3, 2010, which is unprecedented.

**Defendants' Failure To Prevent The Catastrophe**

62.     The risks of offshore drilling are well known to Defendants, and are especially high in the Gulf of Mexico, where floating rigs are used, unlike the permanent rigs used in other areas such as the North Sea. Permanent rigs are anchored to the ocean floor and cannot sink, while floating rigs are far more precarious and subject to disastrous results like this incident.

63.     Moreover, Defendants knew the work the *Deepwater Horizon* was performing was especially risky. In 2007, the MMS raised concerns about oil rig blowouts associated with the exact type of cementing work the *Deepwater Horizon* was doing when it exploded.  Although blowouts due to other causes were on the decline, the MMS study noted that blowouts during cementing work were continuing with regularity, and most frequently in the Gulf of Mexico. Cementing problems were associated with 18 of 39 blowouts between 1992 and 2006, and 18 of 70 from 1971 to 1991. Nearly all the blowouts examined occurred in the Gulf of Mexico.

64.     Defendants were aware of the recent August 2009 blowout in the Timor Sea, which was found to have been caused by careless cementing work. During that incident, which

bears a strong resemblance to the *Deepwater Horizon* blowout, oil leaked from the site for ten weeks, spreading damage over 200 miles from the well site.

65.     The threat of blowouts increases as drilling depth increases. *Deepwater Horizon* was drilling in 5,000 feet of water, to a total depth of 18,000 feet below the sea floor. Defendants were aware of the high risk of blowouts from such deep drilling.

66.     In addition to increasing the risk of blowouts, deep-sea drilling also increases the failure risk of the chief blowout safety mechanism, the BOP. Defendants were aware of the risk of the BOP failing at greater depths, yet did not install a backup BOP activation system or a backup BOP.

67.     A 2004 study by Federal regulators showed that BOPs may not function in deep-water drilling environments because of the increased force needed to pinch and cut the stronger pipes used in deep-water drilling. Only three of 14 rigs studied in 2004 had BOPs able to squeeze off and cut the pipe at the water pressures present at the equipments' maximum depth. "This grim snapshot illustrates the lack of preparedness in the industry to shear and seal a well with the last line of defense against a blowout," the study said. Moreover, the study singled out Defendant Cameron, the manufacturer of the *Deepwater Horizon*'s BOP, for relying on faulty calculations to determine the needed strength for its BOP equipment to function properly at greater depths.

68.     According to an April 28, 2010 article in *The Wall Street Journal,* "Leaking Oil Well Lacked Safeguard Device," the oil well currently spewing crude into the Gulf of Mexico did not have a remote-control shut-off switch used in two other major oil-producing nations, and Brazil, as last-resort protection against underwater spills. The lack of the device, called an acoustic switch, could amplify concerns over the environmental impact of offshore drilling after the explosion and sinking of the *Deepwater Horizon* rig last week.

69.     With the remote control, a crew can attempt to trigger an underwater valve that shuts down the well even if the oil rig itself is damaged or evacuated. *The Wall Street Journal* article observes that the U.S. considered requiring a remote-controlled shut-off mechanism several years ago, but drilling companies questioned its cost and effectiveness, according to the agency overseeing offshore drilling. The agency, the Interior Department's Minerals Management Service, says it decided the remote device wasn't needed because rigs had other back-up plans to cut off a well.

70.     Defendants did not undertake many reasonable precautionary measures that were available to them. For example, they could have installed a back up trigger to activate the BOP in the event of the main trigger failing to activate it. Although the backup trigger is a common drill-rig requirement in other oil-producing nations, including other areas where BP operates, the *Deepwater Horizon* was not equipped with this backup remote BOP trigger. Nor was the *Deepwater Horizon* equipped with a second, backup BOP, as newer rigs increasingly are.

71.     *The Wall Street Journal* article points out that an acoustic trigger costs a mere $500,000. This is a minor cost when considering that the *Deepwater Horizon* has a replacement cost of about $560 million, and BP says it is spending $6 million a day to battle the oil spill.

72.     *Deepwater Horizon* only had one BOP installed, leaving the wellhead vulnerable to disaster if the single BOP fails, as it may have done in this case.  In fact, on May 7, 2010, *The Wall Street Journal* reported in "Oil Regulator Ceded Oversight to Drillers" that the *Deepwater Horizon* did have an automatic "dead man switch," or a separate, remote-control on-off switch to activate the BOP, but it failed to activate the BOP. On top of that failure, the *Deepwater Horizon* lacked the separate, remote-control switch that is commonly used in Norway and Brazil.

73.    Defendants' failure to take precautionary backup measures when drilling at depths they knew to be especially risky was made all the worse by the fact that Defendants were drilling so close to an extremely delicate and important natural resource: the Gulf Coast beaches, coastline, marshes, wetlands, and estuaries that are a wellspring of marine life, and the source of Plaintiff's and Class Members' income or livelihoods.

74.    Defendant BP has a history of cutting corners on safety to reduce operating costs. In 2005, a blast at a Texas refinery killed 15 people and injured more than 170, Federal investigators found the explosion was in part due to cost-cutting and poor maintenance. Also in 2005, a large production platform in the Gulf of Mexico began listing severely due to a defective control system. And in 2006, four years after being warned to check its pipelines, BP had to shut down part of its Prudhoe Bay oilfield in Alaska after oil leaked from a corroded pipeline.

75.    According to the Occupational Safety and Health Administration ("OSHA"), over the past three years, BP has committed 760 willful safety violations – a number made even more shocking when compared to the other large oil companies, who average about five violations each.

76.    Former employees and oil field workers who worked with BP have reported that BP regularly cheated on pressure tests and failed to report leaks and spills to the proper authorities. Most recently, reports revealed that BP is operating its Atlantis rig — a deepwater rig similar to the *Deepwater Horizon* — with incomplete and inaccurate engineering documents, which one official warned could "lead to catastrophic operator error" and disaster like the fate of the *Deepwater Horizon*.

77.    Nevertheless, BP continues to fight for less regulation of the oil exploration and production industry. In 2009 and 2010, BP has spent more than $20 million lobbying the Federal

government on issues including encouraging removing restrictions on drilling on the continental shelf, despite its history of spills and explosions and its knowledge of the high risks involved in such drilling.

78.     Moreover, Defendants have actively opposed MMS rules requiring oil rig lessees and operators to develop and audit their own Safety and Emergency Management Plans, insisting that voluntary compliance will suffice. The *Deepwater Horizon* incident is a tragic example to the contrary. According to a May 6, 2010 *Associated Press* article, "Feds Let BP Avoid Filing Blowout Plan For Gulf Rig," BP did not file a plan to specifically handle a major oil spill from an uncontrolled blowout at its *Deepwater Horizon* project because the federal agency that regulates offshore rigs changed its rules two years ago to exempt certain projects in the central Gulf region.

79.     It remains unclear whether the *Deepwater Horizon* project was covered by the blowout rule.  Instead, a site-specific exploration plan filed by BP in February 2009 stated that it was "not required" to file "a scenario for a potential blowout" of the *Deepwater Horizon* well. According to the article, when questioned about the exemption claim, BP spokesman William Salvin said provisions for handling a blowout incident were actually included in the firm's 582-page region oil spill plan, though he had difficulty pointing to specific passages. Mr. Salvin later maintained that the *Deepwater Horizon* location was not subject to the blowout scenario requirements because it triggered none of the conditions cited in the MMS's April 2008 notice to operators about a loosening of the rules. Still, Mr. Salvin insisted that BP was prepared to handle a blowout and catastrophic spill at the project through provisions included in its regional plan: "We have a plan that has sufficient detail in it to deal with a blowout," while acknowledging that the ongoing crisis at the *Deepwater Horizon* site is "uncontrolled."

80.     On May 27, 2010, *The Wall Street Journal* published an article summarizing its own investigation, "BP Decisions Set Stage for Disaster," which provided the most complete account of the fateful decisions that preceded the blast aboard the *Deepwater Horizon*. In particular, the article points out that BP made choices over the course of the *Deepwater Horizon* project that rendered the oil well more vulnerable to the blowout. For example:

> BP cut short a procedure involving drilling fluid that is designed to detect gas in the well and remove it before it becomes a problem;

> BP skipped a quality test of the cement around the pipe—another buffer against gas—despite what BP now says were signs of problems with the cement job and despite a warning from cement contractor Halliburton;

> Once gas was rising, the design and procedures BP had chosen for the well likely gave this gas an easier path up and out. Workers, pushing to finish the job, removed a critical safeguard, the heavy drilling fluid known as "mud," leaving little to keep the gas from rushing up to the surface. BP has even admitted a possible "fundamental mistake" in concluding that it was safe to proceed with mud removal; and

> A BP manager overseeing final well tests apparently had scant experience in deep-water drilling. He told *The Wall Street Journal* investigators he was on the rig to "learn about deep water."

81.     In addition, the May 27th article indicates that some of BP's choices allowed it to minimize costly delays, since the *Deepwater Horizon* project was operating behind schedule.

82.     By mid-April, BP was convinced it had found a lot of oil. But, until BP engineers in Houston could make plans to start pumping it out, the *Deepwater Horizon* workers on the nearly complete well, in a standard practice, would plug it and temporarily abandon it. According to *The Wall Street Journal* article, "[o]ne of the final tasks was to cement in place the steel pipe that ran into the oil reservoir. The cement would fill the space between the outside of the pipe and the rock, preventing any gas from flowing up the sides." Halliburton, the cementing contractor, advised BP to install numerous devices to make sure the pipe was centered in the well

before pumping cement. Otherwise, the cement might develop small channels that gas could squeeze through. In an April 18 report to BP, the article discloses that Halliburton warned that if BP did not use more centering devices, the well would likely have "a SEVERE gas flow problem." Still, BP decided to install fewer of the devices than Halliburton recommended—six instead of 21.

83.     Despite the well design and the importance of the cement, daily drilling reports reviewed by *The Wall Street Journal*, show that BP did not run a critical, but time-consuming, procedure that might have allowed gas building up in the well to be detected and removed. Before doing a cement job on a well, common industry practice known as "bottoms up," is to circulate the drilling mud through the well, bringing the mud at the bottom all the way up to the drilling rig. BP's decision to cut short the mud circulation could have left gas at the bottom of the well. The article claims that "when workers poured in cement to seal the sides, that gas would have been pushed up the outside of the well. Expanding as it rose, it would have reached the top of the well, where it either would have pushed against a massive seal on the ocean floor or might have gone even higher and reached the bottom of the pipe connecting the well to the drilling rig."

84.     BP's plans for the well, approved by the MMS on April 16, 2010, called for workers to remove mud before performing two procedures designed to make sure gas could not get into the well.  The first procedure called for installing a giant spring to lock the seal at the top of the well in place after removal of the mud. According to *The Wall Street Journal*, there is no evidence in rig-activity logs the spring was ever installed. "If gas was coming up the sides of the well, pushing against the seal, this spring would have helped prevent leakage." Second, BP opted to remove the mud before placing a final cement plug inside the well. Gas could have gotten into the inside of the pipe through a failure of the cement at the bottom of the well. BP was

purportedly planning to set a second, backup cement plug in the well before declaring its work done. But workers began removing mud before setting this plug, leaving little to prevent any gas inside the pipe from rising to the rig. That plan was approved by the MMS on April 16, 2010, according to the permit reviewed by *The Wall Street Journal*.

85.     The fire and explosion on the *Deepwater Horizon*, its sinking and the resulting oil spill were caused by the gross negligence of Defendants, which renders them liable jointly and severally to Plaintiff and the Class Members for all their damages.

86.     The injuries and damages suffered by Plaintiff and the Class Members were caused by Defendants' gross negligence, as well as their willful or wanton failure to adhere to recognized industry standards of care and safety practices.

87.     Defendants knew of the dangers associated with deep water drilling and failed to take appropriate measures to prevent damage to Plaintiff, the Class Members, the Gulf of Mexico's marine, coastal and estuarine areas. Moreover, additional safety mechanisms, technologies, and precautions were known and available to Defendants, but Defendants chose not to employ them on the *Deepwater Horizon*.

**After The Spill, Defendants' Failed Efforts**

88.     On May 3, 2010, thirteen days after the explosion, Defendant BP said in a statement that it "takes responsibility for responding to the *Deepwater Horizon* oil spill. We will clean it up." BP has said it would pay "all necessary and appropriate clean-up costs" from the oil pollution disaster in the Gulf of Mexico, and vowed to consider all compensation claims "promptly" and pay them quickly if justified. Specifically, BP announced that it "committed to pay legitimate and objectively verifiable claims for other loss and damage caused by the spill." "This may include claims for assessment, mitigation and clean-up of spilled oil, real and property

damage caused by the oil, personal injury caused by the spill, commercial losses including loss of earnings/profit and other losses as contemplated by applicable laws and regulations."

89.     But, immediately after the explosion, Defendants attempted to downplay and conceal the severity of the oil spill. Their initial leak estimate of 1,000 barrels per day was found by government investigators to be a fraction of the actual leak amount of 5,000 barrels of oil per day. Moreover, Defendants were slow and incomplete in their announcements and warnings to Gulf Coast residents and business people about the severity, forecast, and trajectory of the oil spill.

90.     According to *The New York Times* article titled "Amount of Spill Could Escalate, Company Admits," on May 4, 2010, in a closed-door briefing for members of Congress, a senior BP executive also conceded that the ruptured oil well in the Gulf of Mexico could conceivably spill as much as 60,000 barrels a day of oil, more than 10 times the low-end estimate of the current flow. This admission further broadens the apparent scope of the problem, which has grown drastically since the *Deepwater Horizon* oil rig exploded and sank into the Gulf of Mexico.

91.     Also on May 4, 2010, BP's chief executive officer, Tony Hayward, told Senator Bill Nelson, Democrat of Florida, that the spill would clearly cause **more than $75 million** in economic damage, the current cap on liability for drilling accidents.

92.     BP has blamed the equipment failure on the *Deepwater Horizon*, which in turn caused both the explosion and its continuing damage, on the rig operator, Transocean. In fact, according to a May 10, 2010 article, "Rig Owner Had Rising Tally of Accidents," *The Wall Street Journal* reports that "[n]early **three of every four incidents** that triggered federal

investigations into safety and other problems on deepwater drilling rigs in the Gulf of Mexico

since 2008 have been on rigs operated by Transocean." (Emphasis added). Moreover:

> Already the largest deep-water driller, Transocean in November 2007 took over rival GlobalSantaFe in an $18 billion deal. A *Journal* analysis of records maintained by the U.S. Minerals Management Service found that Transocean's share of incidents in deep water investigated by the regulator has gone up since the merger, even after accounting for its increased size.
>
> From 2005 through 2007, a Transocean rig was involved in 13 of the 39 deep-water drilling incidents investigated by the MMS in the Gulf of Mexico, or 33%. That's roughly in line with the percentage of deep-water rigs, 30%, Transocean owned and operated in the Gulf then, according to data firm RigLogix.
>
> Since the merger, ***Transocean has accounted for 24 of the 33 incidents investigated by the MMS, or 73%,*** despite during that time owning fewer than half the Gulf of Mexico rigs operating in more than 3,000 feet of water.

(Emphasis added). The article notes that some of Transocean's clients have cited the merger as a

reason they believe the company's performance has dropped.

93.     While the cause of the April 20th explosion has not been determined, and the

investigation is ongoing, investigators are now focusing on two things: (i) a cement seal meant to

keep oil and gas from escaping from a well; and (ii) the blowout preventer, or BOP, a set of

valves on the ocean floor that is supposed to close off a well in an emergency. MMS records

show that Defendant Transocean has had problems with both. According to the May 10th article

in *The Wall Street Journal* article, in 2006, regulators found, a BOP failed, in part because of

maintenance issues, and in 2005, a well leaked drilling fluid because of problems with the

cement seal.

94.     Many questions continue to linger, but the immediate cause of the explosions

aboard *Deepwater Horizon* appears to have been from a build-up of a bubble of methane

hydrates – natural gas compressed into molecular cages of ice – through the riser. This quickly

expanding pocket of methane gas shot up the drill column before exploding on the platform on

the ocean's surface. But, several events leading up to the explosion are believe to have caused or exacerbated the release of methane gas, including faulty materials and procedures used in the cementing process for the well, removal of mud from the riser, defects relating to the blowout preventer valve and improper well depth. Even the emergency valve, installed for just such a disaster, failed to seal the wellhead as it should have, leaving the well spewing oil into the Gulf waters.

95.    The oversight and investigations subcommittee of the House Energy and Commerce Committee has held several hearings, to which top executives of Defendants BP, Transocean and Halliburton have appeared. Also, the Senate energy committee summoned executives from Defendants BP and Transocean, as well as a number of oil industry technical experts to another future hearing.  These hearings are likely the first of many, which will look at the possible problems leading to explosions on the rig as well as the adequacy of containment and cleanup measures.  A separate federal investigation into the explosion is under way by the Coast Guard and MMS.

96.    On May 7, 2010, BP announced that it planned to lower a concrete-and-steel structure known as a "containment dome" almost a mile to the seafloor in an effort to stop the flow of oil from the drilling site. But gas hydrates – ice-like solids that form when methane gas combines with water under certain conditions – clogged the opening at the top of the dome, preventing oil from being funneled to the surface. Doug Suttles, BP's chief operating officer, on a media conference call, said: "I wouldn't say it has failed. What I would say is what we attempted to do last night wasn't successful."

97.    BP removed the hydrates, and took time to determine its next steps. As of filing of this Complaint, Defendants had tried several different fixes for the problem, but are still without

a solution. They have tried and failed with a "junk shot," filling the BOP with debris (*i.e.,* shredded tires and golf ball), followed by heavy fluids, followed by cement to seal it closed – all in an attempt to "clog up" the leak. They have tried and not yet been successful with a tactic called a "top kill" – force-feeding the leak heavy drilling mud and cement – which is routinely used above ground but has never been tried 5,000 feet underwater. Lastly, they have implemented a "containment cap" over the broken wellhead, which has shown some success in capturing and recovering oil and sending it up to a surface ship.

98.     On May 9, 2010, *The Wall Street Journal* in "U.S. Considers 'Malfeasance' in Leak," quotes Coast Guard Admiral Thad Allen, who is leading U.S. government efforts to tackle the disaster, who called it "maddening" that efforts by BP so far to stop the leak have failed. The article also quotes Sen. Richard Shelby (R. Ala.), who told CNN's "State of the Union," that "[a] lot of this could have been prevented…. Where was BP? Were they trying to do this on the cheap? ...Sooner or later there could be a gusher."

99.     Two teams of scientists calculated the well has been spewing between 504,000 and more than a million gallons a day. Using government estimates, anywhere from 23.7 million to 51.5 million gallons have spilled so far. As of June 9, 2010, the Gulf of Mexico oil spill has cost more than $1 billion, while some analysts estimate the disaster could cost up to $40 billion.

100.     The oil spill and the resulting contamination have caused and will continue to damage the value of Plaintiff's and Class Members' real and personal property, their earning capacity, business income, and/or use of natural resources.

101.     There are many other potential affects from the oil spill that have not yet become known, and Plaintiff reserves the right to amend this Complaint once additional information becomes available.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

102.    Plaintiff brings this action and each of the claims herein, on their own behalf and on behalf of all others similarly situated pursuant to Federal Rules of Civil Procedure 23.

103.    Plaintiff brings this action as a class action on behalf of a Class, consisting of all persons who have been impacted by the oil spill and any subsequent remedial events as follows:

> All owners of real property on the Gulf of Mexico shore of the State of Florida who have sustained any legally cognizable economic or business losses or damages as a result of the April 20, 2010 fire and explosion which occurred aboard the *Deepwater Horizon* drilling rig and the oil spill resulting therefrom.

104.    Excluded from the Class are: (a) the officers and directors of any of the Defendants; (b) any entity or division in which any Defendant(s) has a controlling interest; (c) any judge or judicial officer assigned to this matter and his or her immediate family; (d) any individual who has claims for personal physical, bodily injury as a result of the April 20, 2010 fire and explosion that is the subject of this action; and (d) any legal representative of Defendants, successor, or assign or any excluded persons or entities.

105.    ***Numerosity.*** The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or even thousands in the proposed Class comprised of individuals and businesses in the affected area, which have been or may in the future be damaged by the subject oil spill and/or any actual or planned remediation efforts.

106.    ***Typicality.*** Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of laws/regulations, claims, causation and/or damages complained of herein.

107.   ***Adequacy of Representation.*** Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class litigation.

108.   Plaintiff and his counsel are committed to prosecuting this action vigorously on behalf of the Class and have the financial resources to do so. Neither Plaintiff nor his Counsel has interests adverse to those of the Class.

109.   ***Predominance of Common Questions of Fact and Law.*** Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a) whether Defendants caused and/or contributed to the explosion, fire, and oil spill;

(b) whether Defendant were negligent in the design, maintenance, manufacture, or operation of the of the oil rig, its pipes, valves, and other machinery and materials;

(c) whether Defendants knew or should have known of the risk of a major failure of the rig such as that which caused it to fail and resulted in the explosion, fire, and oil spill;

(d) whether Defendants knew of, or should have utilized, all available safety mechanisms to prevent a blowout or seal the wellhead;

(e) whether Defendants knew or should have known that their activities would cause damage to Plaintiff;

(f) whether Defendants acted maliciously or with reckless disregard to the risk of a major failure of the rig, its pipes, valves, and other machinery and materials;

(g) whether Defendants breached duties owed to Plaintiff and the Class, as alleged herein;

(h) whether the law was violated by Defendants' acts as alleged herein; and

(i) whether members of the Class have sustained damages and what measure of damages is proper.

110.    *Superiority.* A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, without a class action, individual Class Members would face burdensome litigation expenses, deterring them from bringing suit or adequately protecting their rights. Because of the ratio of the economic value of the individual Class Members' claims in comparison to the high litigation costs in complex environmental cases such as this, few could likely seek their rightful legal recourse. Absent a class action, Class Members would continue to incur harm without remedy. There will be no difficulty in the management of this action as a class action.

111.    The consideration of common questions of fact and law will conserve judicial resources and promote a fair and consistent resolution of these claims.

## COUNT I

## (Negligence Against All Defendants)

112.    Plaintiff repeats and realleges each and every allegation contained above.

113.    Defendants owed a duty to Plaintiff and Class Members to exercise reasonable care in the construction, operation, inspection, training, repair and maintenance of the *Deepwater Horizon* and oil well.

114.    Defendants had a heightened duty of care to Plaintiff and Class Members because of the great danger and environmental concerns associated with the drilling of oil.

115.    Defendants breached their legal duty to Plaintiff and Class Members by failing to exercise reasonable care and acting with reckless, willful, and wanton disregard for the Plaintiff and Class Members, in the construction, operation, inspection, training, repair and maintenance of the *Deepwater Horizon* and the oil well.

116.    The fire, explosion, and resulting oil spill was caused by the concurrent negligence of all Defendants.

117.    Upon information and belief, Plaintiff maintains that the fire, explosion and resulting oil spill were caused by the joint negligence and fault of Defendants, as evidenced by the following, *inter alia*:

(a)     failing to properly operate the *Deepwater Horizon*;

(b)     operating the *Deepwater Horizon* in such a manner that a fire and explosion occurred onboard, causing it to sink and resulting in an oil spill;

(c)     failing to properly inspect the *Deepwater Horizon* to assure that its equipment and personnel were fit for their intended purpose;

(d)     acting in a careless and negligent manner without due regard for the safety of others;

(e)     failing to promulgate, implement and enforce rules and regulations pertaining to the safe operations of the *Deepwater Horizon* which, if they had been so promulgated, implemented and enforced, would have averted the fire, explosion, sinking and oil spill;

(f)     operating the *Deepwater Horizon* with untrained and/or unlicensed personnel;

(g)     inadequate and negligent training and/or hiring of personnel;

(h)     failing to take appropriate action to avoid and/or mitigate the accident;

(i)     negligent implementation of policies and/or procedures to safely conduct offshore operations in the Gulf of Mexico;

(j)     employing untrained or poorly trained employees and failing to properly train their employees;

(k)     failing to ascertain that the *Deepwater Horizon* and its equipment were free from defects and/or in proper working order;

(l)     failure to timely warn;

(m)     failure to timely bring the oil release under control;

(n)     failure to provide appropriate accident preventive equipment;

(o)    failure to observe and read gauges that would have indicated excessive pressures in the well;

(p)    failure to react to danger signs;

(q)    improper installation, maintenance and operation of BOPs or use of defective BOPs;

(r)    conducting well and well cap cementing operations improperly;

(s)    acting in a manner that justifies imposition of punitive damages; and

(t)    such other acts of negligence and omissions as will be shown at the trial of this matter.

118.    In addition, and in the alternative, the fire, explosion, sinking and resulting oil spill were caused by defective equipment, including the BOPs, which were in the care, custody and control of Defendants. Defendants knew or should have known of these defects and Defendants are, therefore, liable for them.

119.    Defendants knew or should have known that their gross negligence, willful, wanton and/or reckless conduct would foreseeably result in the disaster, causing damage to Plaintiff and Class Members.

120.    The injuries to Plaintiff and the Class Members were also caused by or aggravated by the fact that Defendants failed to take necessary actions to mitigate the danger associated with their operations.

121.    In addition to the grossly negligent actions described above, and in the alternative thereto, the injuries and damages suffered by Plaintiff and the Class Members were caused by the acts and/or omissions of Defendants that are beyond proof by Plaintiff and the Class Members, but which were within the knowledge and control of Defendants, there being no other possible

conclusion that the fire, explosion, sinking and oil spill resulted from the negligence of Defendants.

122.    Furthermore, the fire, explosion, sinking and the resulting oil spill would not have occurred had Defendants exercised the high degree of care imposed on them and Plaintiff, therefore, please the doctrine of *res ipsa loquitur.*

123.    Plaintiff and the Class Members are entitled to a judgment finding Defendants liable to Plaintiff and the Class Members for damages suffered as a result of Defendants' negligence – their acts and omissions – and awarding Plaintiff and the Class Members adequate compensation therefor in amounts determined by the trier of fact.

## COUNT II

### (Gross Negligence Against All Defendants)

124.    Plaintiff repeats and realleges each and every allegation contained above.

125.    Defendants owed a duty to all Plaintiff and Class Members to exercise reasonable care in the manufacture, maintenance, and operation of the *Deepwater Horizon*.

126.    Defendants had a heightened duty of care to Plaintiff and all the Class Members because of the great danger associated with deep drilling from floating platforms, and the especially high risk of blowouts during cementing work such as that *Deepwater Horizon* was performing at the time of the explosion.

127.    Defendants breached their legal duty to Plaintiff and the Class, failed to exercise reasonable care, and acted with reckless, willful, and wanton disregard for the business and livelihood of others, including Plaintiff and the Class Members, in the negligent manufacture, maintenance, and/or operation of the *Deepwater Horizon*.

128.    Defendants knew or should have known that their wanton or reckless conduct would foreseeably result in a disastrous blowout and oil spill, causing damage to the economic interests of individuals and businesses in the area affected by the oil spill.

129.    As a direct and proximate result of Defendants wanton or reckless conduct, which amounts to their gross negligence, Plaintiff and Class Members have suffered legal injury and damages, in an amount to be proven at trial, including, but not limited to, loss of livelihood, loss of income, and other economic loss.

130.    Defendants' wanton or reckless conduct, as described herein, entitles Plaintiff and Class Members to punitive damages.

## COUNT III

### (Negligence *Per Se* Against All Defendants)

131.    Plaintiff repeats and realleges each and every allegation contained above.

132.    Defendants' conduct with regard to the manufacture, maintenance, and/or operation of drilling operations and oil rigs such as the *Deepwater Horizon* is governed by numerous state and federal laws, and permits issued under the authority of these laws.

133.    These laws and permits create statutory standards that are intended to protect and benefit Plaintiff and the Class Members.

134.    Defendants' violations of these statutory standards constitute negligence *per se* under Louisiana law.

135.    Defendants' violations of these statutory standards proximately caused Plaintiff's and the Class Members' injuries, warranting compensatory and punitive damages.

## COUNT IV

### (Oil Pollution Act of 1990 Against All Defendants)

136.    Plaintiff repeats and realleges each and every allegation contained above.

137.    The Oil Pollution Act imposes liability upon a "responsible party for a ... facility from which oil is discharged ... into or upon navigable waters or adjoining shorelines" for the "damages that result from such incident." 33 U.S.C. § 2702.

138.    Section 2702(b)(2)(C) provides for the recovery of "[d]amages for subsistence use of natural resources, which shall be recoverable by any claimant who so uses natural resources which have been injured, destroyed or lost, without regard to the ownership or management of the resources."

139.    The Coast Guard has named BP as the responsible party. The other Defendants have been implicated as well. Therefore, BP and the other Defendants are liable pursuant to Section 2702 for all the damages that result from the oil spill.

140.    As a result of the oil spill, Plaintiff and the Class Members have suffered, or are likely to suffer in the near future, injury to their real property, including spilled oil that has washed ashore or that threatens to wash ashore upon the real property owned by Plaintiff and other Class Members.

141.    Also, as a result of the oil spill, Plaintiff and the Class Members have not been able to use their real property (including, without limitation, air and water, and potentially wetlands and other areas and spaces that have or may become contaminated by the spilled oil) to derive income, for which they are entitled to recover from Defendants for such damages in amounts to be determined by the trier of fact.

142.    In addition, as a result of the oil spill, Plaintiff and the Class Members have suffered, or are likely to suffer in the near future, the diminution in the value of their real property, for which they are entitled to recover from Defendants for such damages in amounts to be determined by the trier of fact.

143.    Section 2702(b)(2)(E) provides for the recovery of "[d]amages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources, which shall be recoverable by any claimant."

144.    As a result of the oil spill, Plaintiff and the Class Members have suffered the type of damages that may be recovered pursuant to Section 2702(b)(2)(E), and they demand compensation therefore from Defendants, namely BP, in amounts to be determined by the trier of fact.

## COUNT V

### (Louisiana Oil Spill Prevention And Response Act Against All Defendants)

145.    Plaintiff repeats and realleges each and every allegation contained above.

146.    The Louisiana Oil Spill Prevention and Response Act ("LOSPRA") imposes liability upon a responsible party for "intentional or unintentional act or omission by which harmful quantities of oil are spilled, leaked, pumped, poured, emitted, or dumped into or on coastal waters of the state or at any other place where, unless controlled or removed, they may drain, seep, run, or otherwise enter coastal waters of the state." La. R.S. 30:2454.

147.    Pursuant to the LOSPRA, the owner of an oil well discharging petroleum pollutants into a waterway is liable for up to $350,000,000 in damages arising from that discharge. Furthermore, pursuant to La. R.S. 30:2482, the owner of the well must pay all pollution removal costs and damages, regardless of any defenses that the owner may assert. As a result of the disaster, Plaintiff and the Class Members have suffered the type of damages that may be recovered pursuant to the LOSPRA, and they demand compensation from Defendants in amounts to be determined by the trier of fact.

**WHEREFORE,** Plaintiff prays for relief and judgment, as follows:

A.    determining that this action is a proper class action, certifying Plaintiff as Class

representative under Federal Rule of Civil Procedure 23, and appointing his undersigned counsel as counsel for the Class;

B.      awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      awarding punitive damages;

D.      pre-judgment and post-judgment interest at the maximum rate allowable by law;

E.      awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

F.      such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all issues so triable.

DATED: June 11, 2010

*Respectfully submitted by,*

**THE LAW OFFICE OF
DERRIEL C. McCORVEY, L.L.C.,**

By: /s/ Derriel C. McCorvey
Derriel C. McCorvey, Esquire (26083)
Post Office Box 2473
115 W. Main Street, Suite 14
Lafayette, LA 70501
Tel.: 337-291-2431
Fax: 337-291-2433
Email: derriel@mccorveylaw.com
        angela_petry@mccorveylaw.com

**WOLF HALDENSTEIN ADLER**
**FREEMAN & HERZ LLP**
Mark C. Rifkin, Esquire (admitted *pro hac vice*)
Steven D. Sladkus (*pro hac vice* admission pending)
Paulette S. Fox, Esquire (admitted *pro hac vice*)
270 Madison Avenue
New York, New York 10016
Tel.: (212) 545-4600
Fax: (212) 545-4653
Email: rifkin@whafh.com
        sladkus@whafh.com
        pfox@whafh.com

**ATTORNEYS FOR PLAINTIFF**

/579174